Do you intend to split the argument within your side? May it please the Court, Mark Fleming. I represent Senate Dean Tirouda, number one on the indictment. And our proposal is this. We've decided to each focus on one or two of the issues raised in the briefs. I will be arguing for seven minutes, reserving the balance of my time. Co-Counsel Mr. McCabe will follow and argue for approximately the same amount of time, reserving the balance. And then if there are any issues regarding the Batson issue raised below, then Co-Counsel Mr. Garcia will address that last. Any questions that your honors may have? Batson's going to be last? Batson's last. That's six minutes then. Right. And then we're going to subtract any time that, if there's any time left, that'll be the rebuttal time that we've sort of gotten the bag. I think you've conserved, if any. All right. Thank you. Your Honor, for ease of argument and to avoid any confusion, there are a lot of Tiroudas in the case. And I'd like to refer to the parties by their first names just to make things a little simpler, simplify the argument. And my client is Zenedine Tirouda. And I would like to focus my argument. Tell me if he's the father, mother, or the son. He is the son. Thank you. He is the central character in the play. And his mother is, just so that we have the names down, his mother is Tata Tirouda. His father, deceased before the trial, is Amar Tirouda. His wife is Zugita Tirouda. And his brother is Zene... Sala. Sala. Sala Tirouda. Okay. So my issue, the issue that I'd like to begin with, is the introduction of a document by government counsel over the timely and repeated objections of defense counsel. And that document is contained in the record as 40A, Government's 40A. And what that consists of is essentially two documents, as we pointed out in our brief, contained within that one exhibit. The one document, the first of the two, is referred to as the log sheet. And the importance of this document becomes obvious in reviewing the record. The only issue with regard to Zenedine Tirouda is whether or not he was born in Meridian, Mississippi, back in 1964, or in 1964. Our entire defense was that Zenedine Tirouda was born in Meridian, Mississippi. His parents were here for a very brief period of time, living illegally at the time, and then approximately when he was 8 months old, returned him to Algeria, where he spent time there, was educated in France, and then returned to the United States on a visa. The government, two weeks prior to trial, contacted a Michelin tire outlet in Algeria and requested that they provide documentation to show that Zenedine's father, Amartya Rouda, was working, was in their employment at the time that Zenedine was born. Now, that would directly contradict and did, in fact, contradict the testimony from his mother, Tata, and as well as Zeno's own testimony regarding what he understood where his place of birth was. The documents that were admitted were devastating to our defense with regard to Zenedine Tirouda. The government referred to these documents in their closing argument and argued that the documents don't lie, that if – and, in fact, I can give the page site to where the government argued this during the closing argument. And this is – I don't know why that advances your record. Of course, they argued it. Right. The question is whether it was admissible. Well – These are the Michelin, the Michelin, Algeria records. Right. And this is 40A, which contained both the law sheet and the letter. These are not admissible, and especially in light of Crawford. Now, Crawford was decided after we filed our opening briefs, but prior to the government's own brief. And, of course, the government raised the Crawford issue in its brief, and it was again raised in our reply brief. This falls squarely within what Crawford prohibits in regards to the introduction of this type of testimonial evidence. The law sheet itself is basically a document written in French, and it contains very limited information. And this is at page 161 of the – I believe it's the government's excerpt of record. And the document, standing alone, really provides no information other than the name, a date of birth, an illegible statement, and then two other dates with the word retired at the end. Now, our position is this. That document itself, the actual law sheet, is not a business record. It doesn't fall within the business record exception to the hearsay rule on its own, because there's no indication that this document was made at or near the time of the occurrence of the matters contained within that document under the law. Wasn't there a certificate attached to the document? There was a certificate. What does the certificate say? I'll read from the certificate. What the certificate is, is it parrots the language of 902.3. And that certificate that Your Honor referred to is at page 159 of the government's excerpt of record. And what it states is that it states just that, that it was made at or near the time. However, there's no real foundation to the information contained in the law sheet. This is by some individual in France who – But isn't that what usually happens with business records? I mean, they don't speak, and if you don't have the person who made the record there, you take the business record for what it says. Right. The problem, though, is that this foreign business record, there's no information that the person who made that particular record had knowledge of the information contained in the law sheet. And I believe the certificate of record – Isn't the person who did the certification the managing director of Michelin, Algeria, and so would be a qualified person under Section 3505? That's the government's position, that that certificate – Why is that wrong? Well, I think that the – given the – what I'd like to do – it may not be wrong in terms of satisfying the law sheet itself. And I want to focus – I want to shift over to the second document, which is really the critical document. Assuming that the law sheet satisfied those requirements, which we don't concede, the second document is the only document that gave any context to this law sheet. And that document is contained – this is the letter, referred to as the letter, and this is at page 162. Now, what this is, is a letter created at the request of the government just two weeks or so before the trial began. The date of the letter is the 15th of December, 2002. What volume are you on? I haven't found what you're referring to. This is at 162 of the government's supplemental excerpt of record. Volume 1. I'm sorry, Volume 1. Go ahead. I can't seem to identify the government's supplemental excerpt. I can't find it either. Do you have it? I can't find it either. Do you have a copy of it? I can pick. Thank you. It's page 162. Usually you hand it to the clerk, but that's okay. Yeah. All right. Can you show me? Can you look at that? I think I've got it. This document was created at the request of the government, and that's clear from the record below. The government contacted the individual at Michelin Tires in Algiers and asked them to provide this document for purposes of the litigation, and it reads, Dear Sir, and this is a translation of the French, but this was also introduced. In response to your letter dated September 18th, 2002, we confirm that Mr. Amar Tiruta, born 7-21-1930, was a member of our staff from 10-30-1963 until 5-51-1991 when he retired from the company. Now, this information goes far beyond anything that can be gleaned from the law sheet. Now, this information is testimonial in nature, and that's why it directly is implicated by Crawford. Justice Scalia, in the Crawford decision, discussed exactly this type of evidence and defined testimonial evidence in the opinion as a declaration or affirmation made for the purpose of establishing some fact, but that's clearly exactly what this letter. Is it really, or is it just provided merely to satisfy 3505? This is not, Your Honor, to satisfy 3505, because it doesn't include any of the foundational requirements set out in that provision. Wasn't it to provide the admission of the Michelin logbook records? Isn't that the purpose of this? No, Your Honor. What this does is provide additional information beyond what's contained in the log sheet. The facts contained in this letter go far beyond what can be gleaned or speculated from the actual log sheet itself. You mean the log sheets don't show that he was working there in 1963? There's absolutely nothing in the log sheet that states that he was a member of their staff from 1963 to 1991. I don't think that was my question. I think my question was, did the log sheet show that he was working there in 1963? The log sheets don't reflect that at all. If you look at the log sheet, it states that there's a column that says 72130. What page are you reading from? I'm reading from page 161 of the government's supplemental excerpt of record. Okay. And then there's a column that says retired, and there's an illegible part before the word Algiers. So this document that was created by the government at the request of the government several weeks before the trial provided additional detailed information that went to the very heart of our defense, and from which the government was effectively able to argue during their closing argument that the documents don't lie, that how could Amar Tiruta have been in Meridian, Mississippi when, in fact, he was working at Algiers at that time. And then Mr. Wheat, during the closing argument, just reads the letter that he had created for purposes of the litigation. All right, counsel. You've more than used your seven minutes. Oh, I have. All right. Is that the only issue you were arguing? I was going to also address any issues that Your Honors might have regarding the jury instruction, the witness accomplice instruction that was given at the request of the government. All right. Thank you very much. May it please the Court. I'm Michael McCabe. I represent the appellant Salah Tiruta. And the issue which I would like to address is the applicability of Crawford to the government Exhibit 50, which, for ease of reference, can be found at pages 23 through 26 of Appellant Salah Tiruta's excerpt of Clerk's Record. Now, the government, this is a document which was basically the centerpiece of the government's case against Salah and Zubida. This was the document which purported to show that the document, the Marriage Certificate 219, which my client Salah Tiruta submitted in his visa application showing that he and Zubida were married in order to qualify for admission into the United States, was false. Now, the government claims that this document is unaffected by Crawford because it's not testimonial in character and refers to the examples which were set forth in the opinion, and those examples being testimony, prior testimony at a preliminary hearing, grand jury or former trial, and to police interrogations. But the language of the opinion itself makes clear that these are not exclusive. The sentence which sets forth these examples begins with the words at a minimum, clearly indicating that the rule has broader reach than the examples which are cited. More importantly, even if a statement limited to indicating a lack of record in the document, which is supposed to be filed in an official location, is outside the purview of the Crawford Prohibition, as you can see from looking at page 23, this particular document went much further than that. The actual language of the document translated into English, which was admitted into evidence, in which the government relied upon heavily to demonstrate that the marriage was a sham, reads, The Certificate of Marriage No. 219 of April 27, 1995, to Ruda Sala and Amirat Zubida, No. 219, false number, date of marriage not confirmed with log signed by the Chief of Service, President of the Assemblée Populaire Communale, my French isn't too good, Town Hall, Hussein Day, Delegation des Signatures Salmi Hassan. Now, that was a note that was made on the back of a document, correct? That's right. And there was a handwritten note. What was the specific objection to the admission of this document? That it constituted hearsay, that it was not within the purview of the exception to the hearsay rule set forth in Rule 803, parens 10, for absence of an official record, and that it was improperly authenticated because it was the foundation for its admission was not attested to or testified to by a person with knowledge. The person who was used, excuse me. Then did you have two objections? One was to the document itself, and the second objection was to the handwritten note on the back? Or were all of the objections to the handwritten note on the back? All of the objections were to the handwritten note on the back. That was the only thing which was relevant. 219 itself, the document, was the document which … Well, it strikes me that you make a good point. But what I don't understand is why the district court just didn't photocopy the front and put that into evidence and not put in the note. Was that discussed with the district court? It seems to me it's an easy way to take care of these. Well, that was not what the government wanted to introduce it for. 219, the whole purpose of this exhibit was the offensive language to demonstrate that this, the government's argument was 219 was a false document which was ginned up, in the words of Mr. Wheat, to reflect an event which did not occur, i.e., the sham marriage between Zubida and Sala. Is this the one where there was some outside evidence of a person testifying that they observed him, looked through and did not find? Yes. This was the one in which Mafud Burala, who was the person through whom the purported foundation was laid, was permitted to testify that he submitted this document to a person who identified himself to him as the chief of the civil registry in Hussein Dey, that this person then took the document, went behind him, looked in a book, came back and said this document does not, is not reflected in the log, or words to that effect, over a hearsay objection. And then he was permitted to then say, to lay the purported foundation for the admission of this document, that he then requested the individual, the chief of service at the civil registry, to write the language which appears, the offensive language, the language to which we object. Yes. If that document were excluded now by the court, would not the testimony of the individual, provided it's not subject to objection, would the testimony have been sufficient, that there was no prejudice of the document coming in? I don't believe so. First of all, I don't see how the testimony of this, are you talking about if the chief of service from Algeria, or are you just talking about Mafud Burala, the person who was a U.S. Embassy employee? Assuming his testimony came in, it was not objectable, that's the second issue. Wouldn't that be sufficient, that there wouldn't be any prejudice of having the document in? I don't believe so, because his testimony did not establish the lack of a record. It was incumbent upon the government in order to demonstrate that this marriage was false, that the marriage certificate which was presented, which was prima facie evidence of the validity of the marriage, was in fact a false document. And there was no way that Mr. Burala could be qualified, nor did his testimony go to that point. Qualified to do what? Excuse me? If he observes somebody else do a search, what qualifications does he need other than he's awake and he's got eyes? Well, I think that he has to be able to testify to the prerequisites set forth in 803.10, which are that the records in issue are regularly made and preserved by a public office or agency, that the matter, if it occurred or existed, would have been the subject of such a record in the agency, that diligent search was conducted in the files of the office or agency, and that such a search failed to disclose the record of the matter. Since he had no familiarity with the record-keeping practices of the civil registry in Hussein Dey, Algeria, he was not qualified to testify to any of those prerequisites. But what is the prejudice standard that you have to meet, even if it's there, omitting the document? What is the prejudice standard you have to meet? I think because of Crawford, since it implicates the constitutional right of confrontation, it's the Chapman standard of harmless beyond the reasonable doubt. That's what you're talking about. For Burala's testimony, I'm talking about the document. I'm talking about the document.  So you're saying that the same Crawford rule would apply to the document? The Crawford rule applies to this document because it's testimonial in nature, that is, testifying that it is testimony, hearsay testimony, that number 219 is a false number and the date of marriage does not conform with the law. Therefore, it is testimonial. Therefore, the confrontation rights of the appellant are implicated. That being the case, the standard is Chapman. Which is? Harmless beyond a reasonable doubt. All right. Thank you, counsel. Your time is up. And we need to hear something from Zubita's counsel. Good morning. May it please the Court. Robert Garcia on behalf of Zubita Teruta. She's married to Zinedine Teruta. Was it purposeful discrimination by the government when they struck two Hispanic jurors and was the Court's ruling clearly erroneous when it overruled our bats and objections? One of the jurors, Ms. Ojeda, whose Hispanic was struck, the reason given by the prosecution was that he always strikes teachers and she has experience with foreign documents. He doesn't believe that this would, quote, translate well with the other jurors. Can I? Can I? I understand. We've read the briefs. We know what your arguments are on that. All right. But there's some more fundamental points we need your assistance on. The first I'd like to ask you is we know from the record that these people had Spanish surnames. Was there any stipulation that they were Hispanics? There was no stipulation but then no objections to the point raised by a co-counsel that they were. Well, under Chanco, we have stated, I think it's probably a holding, that ordinarily, therefore, surnames alone would not suffice for bats and challenge. And the discussion at note one of the case points out that people can have an Hispanic name but not have an ethnic, but not be ethnically Hispanic. How do we get around whether or not a prima facie case has been made if we have held that the names, surnames alone are insufficient? Well, I believe in Ms. Ojeda's case, who's a juror, she testified during Verdiere at excerpts of record 58 through 60 that she was, she did immigrate from Mexico. No, she said she was from Mexico. It didn't say she was Hispanic. Well, she's from Mexico. I believe Hispanics includes and encompasses the country of... Everybody in Mexico is Hispanic? Yes. Is that right? Is that your argument? That's my belief, yes. Well, my grandfather, my great-grandfather was Spanish and something else and he was from Mexico. There's a large group of people south of the border that are English. I even met one this last weekend. So your view and my view may be different. But getting to the position if we don't have a presumption, how do we get across the prima facie case? There's no stipulation or nothing in the record as to ethnicity, only to the surname. Is that correct? Well, no, Your Honor. I believe co-counsel made the objection based on the fact that we only have three Hispanics and that the two in question were Hispanics. That was not challenged by the district court nor by the prosecution. If it had been an issue, they would have made it an issue and they did not. We submit that they were Hispanics. Well, you know, they don't have to object to it if we've already held this insufficient. Well, let's go on beyond that point. Then the next issue that we get to is whether the district court said enough. And if I understand your argument is that when the district court in working on this says I find that Mr. Wheat has given a sufficiently neutral reason as to each juror that that's insufficient and you rely on Alanis, correct? I rely on Lewis, yes. Alanis I think is the case you're relying on. In Alanis, what the government offered was a, quote, plausible explanation, close quote. We don't have that here. If it isn't a plausible explanation, she made a finding that there was a sufficiently neutral reason as to each juror. Is that different from the Alanis case? And if so, how would it affect us here? I believe I didn't cite the Alanis case, Your Honors. It came out after your brief. Oh, sorry about that. I didn't. July of 2003. But Alanis cites Lewis for that proposition. And the proposition again being? The Alanis is the closest case for your winning on this point. Right. I ran a cite check on Lewis, and I just didn't pick it up. You didn't pick up Alanis in your last minute cite check? Last cite, right. That's correct, Your Honor. All right. You're not in a position to help us any. Then let me go to the next question I wanted to raise with you, and it's this. In most cases where the district court makes a finding but counsel feels it's insufficient, our law requires counsel at that time to object and to request additional specific findings. And we do that for good reason. It's right before counsel. It's time to protect your client, call it to the attention of the district judge, let the district judge make the finding, up or down, right or wrong. This case, it's a little different. I don't think there was, and you can correct me if I'm wrong, that there was an objection to the finding made or a request for additional specific findings in this case. That's correct, Your Honor. There was none. The Court was quite clear in her position, and when she made her ruling, it was that sidebar in front of the jury. It was the only objection made at that time. Well, Alanis, which you haven't read, says that she has to go further and test the credibility of the government that that's actually the prosecutor's clean and pure. That finding wasn't made. The only finding was a less inclusive finding that there was sufficient neutral reason. If we apply our general law that at that time it's incumbent upon the lawyer to ask for additional findings on the issue, then we would say that that issue has been waived. And I want to find out from you, why shouldn't we apply that rule in this case? Well, for the exact reasons, we were there in trial, and we were at sidebar. The Court made its ruling and just turned away and resumed her position on the bench. She was not interested in hearing any more. We have experience before this judge. She's a good judge. We're not complaining about that. We're just complaining about her. But it seems to me that whether she wanted to hear anything or not, you have a responsibility to make a record for your client for appeal. And if you don't ask for additional findings beyond these, object and ask for additional findings, I wonder if the issue has been waived. That's what I really need to find out from you. I don't believe it has, Your Honor, because the issues that we're raising here were presented, were actually there. The facts, the facts that the grounds given by the prosecution for the challenge of these two, the two jurors in question, the answers that they gave, the fact that other jurors had similar backgrounds but were not struck by the prosecution, those facts are clearly on the record, and we believe were in the mind of the Court when it, when the Court made its ruling. All right. Thank you. You're well over your time, so we'll hear from the government. Thank you. Good morning. Michael Weed for the United States. I might start with where we left off on the Bassin issue. The exact quote from the defense at sidebar was, there are, by our estimation, three potential jurors out of 50 who seem to be Hispanic. Bless you. There was no finding and no stipulation that they were the only Hispanics, and there was no inquiry of the jurors of their ethnic or racial background beyond that statement. The Court So did the district court then just assume a prima facie case? She didn't require a prima facie case, and as is frequently the case, the Court just turns to the government and says, what's your reason? And the United States stated the reason there in court for these two jurors. Counsel makes a point that other jurors were similarly situated, and that's not correct. There were other teachers, and I do like to exclude teachers, and there's some reasons for that. But when I look at that, if the whole jury were teachers, I'm going to have to pare that down and find those that have other issues that I think would not be suitable for the case. What do you make of this line in Alanis? And I don't know if it's, let's see, that Murillo is 2002 and Alanis is 2003. But in Alanis, the panel held that the trial court has a duty to proceed to Step 3, even absent further requests from counsel, because it is not until Step 3 that the court rolls on the ultimate question of intentional discrimination. Well, I think when ‑‑ I understand the line, but I think when Judge Gonzalez heard the government's explanation for striking these two particular jurors, the male juror who had had a problem crossing the border, who felt hassled, and who had had a brother who had been convicted by the government for importing narcotics, and the female were fresh in her mind. I mean, she realized what the government was saying was, in fact, correct. It wasn't a made‑up issue. And she accepted that. And she made specific findings that those were not just something that was plausible, that they were a sufficiently neutral reason that the government could validly exercise a peremptory challenge as to these two jurors. What exactly did she say? What was her finding? Page 60. It's 60 of the ‑‑ It's 60 of the numbers. I'll read it for you to save time. Thank you. If you are asking that the strike not stand, the motion is denied. I find that Mr. Wheat has given us a sufficiently neutral reason as to each juror, prospective juror, as to why he struck them. So the motion is denied. She made specific findings. Having just heard during voir dire what the jurors had to say. And the government summarized, in essence, you know, why those jurors were objectionable to the government. But I would go on with the Atlantis quote further than Judge Wardlock. The next paragraph, the court says, We hold that a defendant's original objection to a prosecutor's allegedly discriminatory peremptory strikes, even after it's met with the prosecutor's gender neutral, there was a gender question, gender neutral explanation, imposes on the trial court an obligation to complete all steps of the Batson process without further request, encouragement, or objection from counsel. So it sounds like, you know, it becomes another ritualistic exercise. I think she could have gone, according to that decision, she could have gone further. And so now what do we do? Because she didn't. Because that's a flat statement by the court in Atlantis that the trial court has to do it. So what do we do? And of course she didn't have the benefit of reading it when she was trying the case, because it was tried before this was decided. Correct. So I don't know that you can hold her to that standard. I mean, I think she was operating under what she believed the law to be at the time. Yeah, I was a district court judge, too, and I honestly don't remember always going to the third step. But, again, that was pre-Atlantis as well. Well, also the problem is we never get to the first step. We always go to the second step. Right. Because the prima facie showing is never made. It's always just a bare bones allegation without going into a detailed analysis. So the prima facie, it generally looks like we're skipping step one and step three and going to step two and making a decision. So I think in the light of Atlantis, that might direct the district court to make a different decision in the future. That's an interesting question. In this case, what can we do? And in Atlantis, the court of appeals made an actual finding that the showing by the prosecutor was not adequate, that if you look at the venire and the people struck, that the explanation didn't hold up. Here we don't have that situation. Could we remand it to the district judge and hope she remembers what happened enough to do step three now? Well, I don't know that you could do that because you don't have the jury there. I mean, there is nothing in the record to state, you know, what the ethnic or racial background of the other jurors were. This whole objection here is based upon their surnames and only their surnames. Of course, they're making the objection before a judge with a Hispanic surname. Exactly. She moved off number one and got to number two. And in cases where that's happened before, we just assumed along with the trial judge. I'd object to that. But, in fact, the part that's missing here, that's required under Atlantis, is a determination of the prosecutor's state of mind. She needs no more record for that, along with what Judge Nelson is talking about, does she? She knows the record. She knows what was before her. It isn't like this happened 15 years ago. That's correct. Why would we not provide the opportunity of having her look at it with a new case, which she was not aware at the time, and make application and take such additional testimony if she chooses to do so? That certainly is permissible and it could occur in this case. But the record itself, if you read the record, it is devoid of ethnic or racial makeup of the jurors, beyond this conclusory estimation by Mr. Fleming as to what they believe. I mean, I don't sit down and ---- It would be like a good step one argument. Do you know of any cases where we've gone back to step one, where the district court has skipped over to get to step two? No. We never get to step one, and that's the problem. You know, we always skip step one, and the judges routinely, I don't know if it's just, okay, state your reasons. I mean, we generally have a good reason for what we've done, and we state those reasons and the court makes a decision based on that. Do you think there's any likelihood that if we were to remand, that Judge Gonzales wouldn't make the determination that there was no purposeful discrimination based on this record? That she would find discrimination? Yeah. I don't think she would find discrimination based on the record of the way it is. She didn't find it then, and it was certainly fresh in her mind. She certainly saw the jurors. She made an evaluation of what the facts were at the time. Well, the whole thing seems rather futile and overly technical and judicially inefficient. I suppose you could do it from the record, figure out that if she found that she had no discriminatory motivation on this, the possibility that she would find that there was purposeful discrimination in general is minute. Less than that, I would think. In relation, if I might address the other issues at this time, counsel brought up the Michelin documents and the false marriage certificate document, and both counsel hung their hat upon Crawford and stated that this was a Crawford violation. The problem with that is their objection, as Judge Wallace asked the question, their objection below and as stated in their brief was a hearsay objection. There was not a Confrontation Clause Sixth Amendment objection made, and because that was not made under California v. Green, it is forfeited. It is waived. There is no confrontation constitutional issue before this Court. The issue is a hearsay question. The objection that they have to these documents comes down to their desire to cross-examine what is in effect a custodian of records in these cases. Beginning with the Michelin documents, as the Court can see and as counsel read from the letter, we had initially approached Michelin in France, because Michelin was a French company and sent an MLAT there in September before, because in a review of the Mississippi trial transcript, it revealed that the father had retired from Michelin. And our efforts in France were, they said, no, it's not here, it's really in Algeria, so which focused us then on Algeria in December. And our communique with the director of Michelin there, we asked him for employment records. He wrote back and sent us a cover letter. He said the cover letter is not enough. You've got to send us the raw data that supports that information. There's nothing in the cover letter from Michelin that's not contained in the actual logbook. There's a cover page that goes along with those. It's entitled Record of Personnel, and it's the Record of Personnel from Michelin. It gives their name, their employee number, their nationality, their address, their date of birth, the date they started and the day they left and how they left. In this case, it indicates he was retired, and it covers specifically the time period. That alone was not the only basis. By the defendant's own word in his asylum application, the father returned to Algeria after the Civil War, when Algeria had its independence from France in 63, and remained there since that time. That's by his very own words in his asylum application. So, I mean, that's clearly supported by both the testimony in Mississippi and by the asylum application. Those documents are not Crawford. It's a hearsay issue. They were authenticated under 18 U.S.C. 3505. The certificate clearly states that these documents were prepared by somebody who had an obligation. There is no obligation that the managing director have personal knowledge of that information. This Court has found that on numerous occasions, that there's no requirement that the custodian have personal knowledge of that information. Counsel, I'm more troubled by the handwritten notes on the back of the purported marriage certificate, 219, by the chief of the registry. Why is that not an admissible hearsay? It's not admissible for several reasons. The records that we're talking about here are based on as if a legal citation. If I were to walk across the hall to the librarian and say, I want to see the Miguel case at 335 Fed Third 995, she could take that information and go and find that book, pull it out and turn to that page, and if it were not there, she'd say, that's wrong. Here we sent a Foreign Service investigator with the document that the defendant had provided in his application and said, is this real? He looks at the number. He looks at the name. He turns and goes to the place where that information should be found. He turns to the page. He looks. He says, it's not there. This number's not right. It's false. And he looks at the log. It doesn't conform to the log. And he writes that on there. The defense had this information from the time the defendants were indicted. Sala and Zubida-Tarruto were included in the superseding indictment in November of 2002. This case went to trial in January of 2003. At no time did they make any effort or complain that that was an inadequate foundation. They had an opportunity to subpoena the custodian of record if that were a problem. They certainly subpoenaed other witnesses from Algeria, and the government assisted in bringing those witnesses, and we would have brought that custodian if that had been an issue. Instead, they complained that that is inadmissible hearsay. It is not testimony. All it is saying is that there's no record here. It's the absence of a record. Proving the negative. Proving the negative. That's correct. And there is no record of that. Even with that document out, if you excluded that document from the mix, and considering the charge of possession of an immigration document obtained by fraud, the rest of the factors and the evidence presented by the government are more than sufficient to support a conviction on that count. For example, the defendants claimed that they were married when they came here. Well, we know from the evidence that Salah Taruta had, in fact, divorced his wife, and that he had divorced her by intoning the words in Islam, under Islamic law, in Algeria before they even went for their interview. It requires 90 days, and the list of the date of the divorce is May 15th. The divorce, those words would have to have been intoned three months before, which would have been February 15th. They appeared before the consular officer at the American Embassy in Algiers and swore that they were married, and they took their application, that he was bringing her to the United States as his wife. When they showed up at the port of entry at Los Angeles, they told the immigration inspector, we're husband and wife. They obtained that status by fraud. And they already had that information and all the facts that surround them that show that that was not, in fact, the case. There is no record of their divorce, okay? It's only this Islamic divorce. Their own expert witness testified at trial that the Islamic divorce is not recognized in the civil courts, particularly where two defendants are within the civil jurisdiction of the United States, and it is merely a religious formality that's done for religious reasons, not for the civil purpose of the divorce. Does the Court have any other particular issues that I might address? Very good. I thank you. Thank you, counsel. You can have a few minutes for rebuttal. I have a question for you also on the Batson claim. Yes. Zinedine did not join, especially join in that claim? Yes, he did. Where did he join that claim? I had the same question. I didn't find that you joined that claim. I believe that we joined each other's. Oh, you're talking about at the actual time of it? I'm saying where in the record does it show that you joined in the Batson claim? On page 58 of the, this would be Zubida-Chiruta's excerpt of record, which is page 88. No. Claim on appeal. Oh, I'm sorry. I believe, I thought that all parties joined in each other's motions or issues on appeal. I can find that for you. We didn't find it. We didn't see where you joined. And you need to join on, you know, the claim on appeal. If there wasn't a specific joined or filed, then that was an oversight, and I'd ask to leave the Court to join that issue. I was very much involved in that, in raising that issue, and certainly joined it below, and had thought that we had all filed joiners on each other's issues. Well, I know that the other two did. All right. Well, if I did, that's an oversight, and I'd ask to leave of the Court to join in that issue, because I certainly would not want my client to not be the beneficiary of that issue. In addressing that issue, Your Honor, at the time, on page, this is at page 7 of Zubita Taruta's opening brief, where it's, there's an actual quote. It quotes me during the time that the Batson challenge was raised. And what I said at the time to Judge Gonzales is that there are only, by our estimation, three potential jurors out of 50 who seem to be of Hispanic descent. Mr. Wheat has struck two of the three, and this is what begins the Batson challenge. Now, from that comment, and having been there, what we were looking at was the veneer pattern. And the only way, the only logical way that we could have raised this issue, where all the parties completely were on board, nobody said, well, I don't think your, I think your numbers are off. I think there might be more or less. None of that was because of the appearance of the individuals in the veneer. Why is that? Why wouldn't, why weren't you referring to the surname? We don't know that. That's not in the record. I think when you read the record, when you read that quote, the only logical interpretation of that is that we're looking at a veneer panel of 50 people. Counsel, we're talking about whether you've made a sufficient record. Right. And that's the responsibility of counsel. We can't estimate or speculate. There has to be something there. Now, maybe you're going to get around it because Judge Gonzales gave you the point and went on to step two, but I don't think you're going to be able to find a record here. I think that, I think you can look at that quote, and some reasonable people could say that this certainly raises that clear inference, that we're talking about appearance because we're looking at 50 people in a veneer panel, and the direct reference was that three of them appear to be, seem to be of Hispanic descent. So I also want to clarify the record with regard to what was preserved below. With regard to the Exhibits 40A, the documents that are contained in 40A, there was a specific objection based on the Confrontation Clause, and that's contained at page 49 of the defendants of Zenedine Taruta's excerpt of record. And the Confrontation Clause is referenced in the objection. Quote, even if they satisfy an exception, we are left with the same Confrontation Clause that we dealt with before. So this is something that was ongoing. And that can be found at page 49 of Zenedine Taruta's excerpt of record. So there was an objection raised at the time, even though the Crawford decision hadn't yet come down. We were already targeting in on the Confrontation Clause problem. I disagree strongly with Government counsel's assertion that that second document is simply some type of a summary. The letter is a summary of the log sheet. If you compare the two side by side, there's simply no way you can draw the information contained in the letter based on what's contained in this log sheet. I think if anybody attempted to do that during the trial, there would have been a speculation objection sustained. It simply doesn't follow. This was a document created by the Government to drive home the only central point with regard to Zenedine Taruta. Thank you. We need to sum up. Thank you. I appreciate it. Thank you, Your Honor. Your Honor, may I have permission to join in that issue on the Batson challenge? If it's not somewhere in the record, that was a complete oversight on my part. Do you want to make a motion? I'd make a motion to do it. We don't take oral motions. I can write it down. You might want to submit a written motion. I think I'm going to do that. Thank you very much, Your Honor. Just briefly, as to the lack of a confrontation objection there, I don't believe that confrontation was that specific magic word was intoned during the colloquy as to the admission of Government's Exhibit 50. However, I point out that prior to Crawford, a firmly rooted hearsay exception automatically satisfied the requirements of the Confrontation Clause, so it was the same thing at that point in time. And in any event, the government failed, as I've indicated in my opening remarks, to comply with the provisions of 803.10 because none of the four prerequisites could have been established or were established by Mr. Buralla, a U.S. Embassy employee. In addition, the document was not sufficiently authenticated. As I've indicated in my briefing, in this circuit, authentication is strictly required. He was not a person with knowledge for the same reasons. He had no background, experience, or knowledge of the record-keeping system, and therefore was not in a position to testify that the document was what it purported to be. The government certainly had the opportunity and could easily have complied with the requirements of Section 902.3 and 803.10 by simply getting a self-authenticating document into evidence attesting to the lack of a record. The government knew how to do that with respect to the Michelin records, but which it had in its possession for a lesser period of time than this particular document. This particular document was what caused it to indict Mr. Salaciruta in the first instance, and for some inexplicable reason, they simply did not comply. All right. Thank you, Counsel. All right. Thank you. The matter of U.S. v. Tiruta is submitted. United States v. Hetrick is also submitted on the briefs, and the Court will adjourn for this.
judges: Wallace, T. G. Nelson, Wardlaw